UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

**FILED**

**10/28/2024**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

| | |
|---|---|
| ASHOK K. LALWANI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.  1:24-cv-01905-JPH-CSW |
| v. | ) |
| | ) |
| THE TRUSTEES OF INDIANA | ) |
| UNIVERSITY; DR. LOPO REGO, | ) |
| and DR. ANGIE RAYMOND, *in* | ) |
| *their individual and official* | ) |
| *capacities* | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff, Ashok K. Lalwani ("Lalwani"), by counsel, for his causes of action against Defendants, The Trustees of Indiana University ("IUB"), Dr. Lopo Rego ("Rego"), and Dr. Angie Raymond ("Raymond") in their individual and official capacities, alleges and says:

### PRELIMINARY STATEMENT

1.      This is an action for discrimination and retaliation on the basis of Lalwani's color, sex and/or national origin by IUB in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") and/or Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1689 ("Title IX"), and for various other related federal and state law violations by the Defendants.  Lalwani is seeking all appropriate legal damages and equitable relief to redress the violations of his rights by the Defendants.

### JURISDICTION AND VENUE

2.      This court has subject matter jurisdiction of Lalwani's claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1367(a).

3.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is appropriate in the Southern District of Indiana, Indianapolis Division, because the events alleged in this Complaint took place in Bloomington, Monroe County, Indiana.

<u>ADMINISTRATIVE PROCEDURES</u>

4.      Prior to filing this Complaint, Lalwani filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violation of his rights under Title VII.

5.      On July 30, 2024, the EEOC issued its Determination and Notice of Rights pertaining to Lalwani's Charge No. 470-2023-04307.  This Complaint was filed within 90 days of Lalwani's receipt of that notice.

<u>STATEMENT OF FACTS</u>

6.      Lalwani is a Professor of Marketing at the Kelley School of Business ("KSOB"), IUB, and of Indian origin.

7.      Lalwani has been a Professor at IUB since July 2011.

8.      Prior to May 28, 2016, Lalwani enjoyed a positive and productive working relationship with his colleagues. He consistently received positive evaluations, was renowned for his collegiality, and was considered a valuable member of the department. However, shortly after this date, Lalwani experienced a sudden and dramatic change in treatment, including discrimination, shunning, and a hostile work environment.

9.      Some faculty members would openly shun Lalwani, refusing to acknowledge him or respond to his greetings. Lalwani also began facing discriminatory treatment in other areas, such as salary increments, which did not align with his performance.

10.    The discriminatory treatment was specifically targeted at Lalwani and was not observed to be directed at other male employees or employees of Indian origin.  Some tenured faculty members privately informed him that his mistreatment was related to heightened sensitivity due to the 'me-too' movement.

11.    Lalwani believes that the discriminatory treatment he experienced would not have occurred if he were female or of a different national origin, demonstrating clear violations of Title VII and Title IX.  The sudden change in treatment and the nature of the discrimination experienced by Lalwani are directly related to his status as a male of Indian origin, combined with a neutral characteristic, resulting in unlawful discrimination under federal law.

12.    In September and October 2022, Lalwani raised concerns about unlawful discrimination with his department chair, Professor Lopo Rego ("Rego") and the then Executive Associate Dean for Faculty and Research at KSOB, Professor Jamie Prenkert ("Prenkert").

13.    Following Lalwani's complaint, Rego and the Associate Chairperson of the Marketing Department, Professor Daniel Smith ("Smith") invited Lalwani for a meeting during which they assured Lalwani that they would work with the KSOB Dean's office to address his discrimination concerns. Relying on these assurances, Lalwani waited several months for a resolution, but they ultimately failed to take any meaningful action.

14.    Instead of addressing Lalwani's concerns, Rego's behavior towards him became increasingly hostile. He singled Lalwani out in the department, targeted him, initiated a campaign of harassment, retaliation, and intimidation against him. Rego appeared to be actively seeking faults in Lalwani's work, subjecting it to increased scrutiny and criticism.

15.    In an apparent zeal to punish Lalwani for his discrimination complaint, Rego applied different standards to evaluate his performance versus that of his colleagues, and blatantly violated numerous IUB, KSOB, and Department of Marketing policies.

16.    Although Smith is not formally listed as a defendant in this Complaint, he played a significant role in his capacity as Associate Department Chair. His name appears alongside Rego's on official documents, indicating that all formal administrative actions referenced in this Complaint were jointly undertaken by both individuals. To avoid redundancy, Smith's name is not mentioned each time alongside Rego's, but his participation is integral to the administrative actions described.

17.    On March 1, 2023, Rego prepared an unprecedented and negative performance evaluation memo specifically targeting Lalwani. This memo was extensively based on distorted, misrepresented, or unsubstantiated allegations, hearsay, and unsolicited cherry-picked student comments—an action that, to Lalwani's knowledge, was not taken with any other faculty member in the department of approximately 50 faculty. Such actions violated IUB policies ACA-17, ACA-27, and BL-ACA-D22, which explicitly prohibit the inclusion of unsolicited, anonymous, and unsubstantiated information in faculty performance evaluation.

18.    Upon information and belief, no other Full Professor in the department received a written performance evaluation memo ever in the past or since then. Indeed, Rego did not prepare any written performance evaluation memos for any other Full Professors in the department, further underscoring the unusual nature of this evaluation.

19.    This was the first negative annual review memo in Lalwani's 18-year academic career, marking a significant departure from previous annual evaluations. Indeed, due to his strong performance, Lalwani was tenured in 2014 and promoted to Full Professor in 2022.

20.     Rego denied Lalwani due process, did not ascertain the veracity of the allegations with him, and did not permit Lalwani to defend himself against unnamed accusers. When Lalwani contested the contents of the memo, the section on collegiality was removed (although the original memo is still being used by the KSOB Dean's office). Nonetheless, the material concerning his teaching remains.

21.     In or around February/March 2023, Rego recommended (and Prenkert approved) the lowest salary increment (amounting to 0.10% or $300) for Lalwani for AY2023-2024 not only in the entire department but likely also the lowest permissible raise at IUB, even though Lalwani's overall performance was above the department median. This contrasts with an average base salary increment of $8,425 received by the remaining tenured and tenure-track faculty in the department. Lalwani's *de minimis* $300 increment, amounting to less than 4% of the average raise, effectively froze Lalwani's salary while his peers received substantial increases. The $300 raise is the lowest Lalwani has received in his entire academic career spanning 18 years, aside from times of institution-wide salary freezes.

22.     IUB policies BL-ACA-D27 and ACA-33 outline a progressive approach to discipline, recommending that administrators first attempt to address concerns informally through counseling or negotiation before pursuing formal actions. However, Rego disregarded these steps, escalating directly to formal documentation and disciplinary actions without attempting prior informal efforts, without soliciting Lalwani's perspective on the allegations, and without providing Lalwani the opportunity to defend himself.

23.     Rego's salary recommendation for Lalwani violates IUB policy by disregarding research and service performance:

a. IUB policy BL-ACA-E23 mandates that salary decisions should reflect the overall contributions of faculty members to research, teaching, and service, with weights outlined in the unit's salary policy statements.

b. The KSOB salary policy states that salary increments should reflect the *total mix* of a faculty member's contributions to research, teaching, and service.

c. The Marketing Department's evaluation policy outlines weights for Full Professors: 50% research, 30% teaching, and 20% service.

d. In 2022, Lalwani's weighted average (composite) score of 2.9 exceeded the department median of 3.0 (1 = Highest, 5 = Lowest).

e. Despite Lalwani's above-average performance, Rego recommended the lowest salary increase for Lalwani in the entire department (a *de minimis* 0.10% or $300), compared to an average raise of $8,425 for other faculty.

f. Rego's decision to base Lalwani's salary increment solely on teaching performance, while ignoring high ratings in research and service, violates these policies.

24. Rego's salary recommendation disregards Lalwani's documented history of exceptional performance, violating policy:

a. The KSOB salary policy emphasizes considering a faculty member's performance "*in the preceding year and in approximately the last five years.*"

b. The Marketing Department's salary policy emphasizes "*long term performance*" alongside short-term performance.

    c.      Prior to 2022, Lalwani's performance evaluations were exceptional, with top-tier ratings in research and teaching, above-average ratings in service, and top-tier weighted average (composite) scores.

    d.      Rego's salary recommendation neglected both Lalwani's 2022 research and service performance and his exceptional past evaluations, violating policy.

    e.      Based on policy, Lalwani's annual raise for the academic year 2023-2024 should have been significantly above the department average of $8,425.

25.    Rego primarily attacked Lalwani's teaching and conduct based on unsolicited and anonymous comments.

    a.      The use of unsolicited information from select students, in addition to formal end-of-semester student feedback surveys, is widely recognized to create redundancy, and lead to double counting and selection bias in faculty evaluations.

    b.      Multiple IUB policies (ACA-17; ACA-27; BL-ACA-D22) prohibit the use of unsolicited and anonymous information in faculty evaluations.

    c.      IUB Policy ACA-27 specifically states: "*Unsolicited communications about an appointee shall not be included*" in personnel files except in certain circumstances not relevant to Lalwani. Similarly, IUB policy BL-ACA-D22 unequivocally states: "*Unsolicited or anonymous information may not be considered by the Board*."

    d.      To the best of Lalwani's knowledge, unsolicited comments were not included in the annual review memos of any other faculty members within the department, indicating disparate treatment.

e.    Professor X's students vociferously complained about their teaching to the department chairs, who intervened in the middle of the semester. However, these unsolicited complaints were not documented in Professor X's annual review memo.

f.    The Marketing Department Performance Evaluation Policy outlines established criteria for evaluating faculty performance, which should be the sole basis for Lalwani's evaluation, but Rego seemingly ignored those in Lalwani's case.

26.    Rego's teaching evaluation of Lalwani violates Department of Marketing policy:

a.    According to the Marketing Department's performance evaluation policy, faculty members' teaching effectiveness is primarily assessed using student ratings from the online course questionnaire (OCQ) administered by IUB. Specifically, the policy states that faculty whose average scores on two key metrics - Question 18 ("Instructor is Outstanding") and the Dean's 8 composite[1] - fall between 5.0 and 5.99 (on a scale of 1 [lowest] to 7 [highest]) are assigned a teaching performance score between 3.0 and 3.9, indicating an "average" performance.

b.    Lalwani's mean scores across all three sections taught in Fall 2022 were: Dean's 8 Median: 5.92; Dean's 8 Mean: 5.71; Q18: 5.03.

c.    Per policy, Lalwani's student evaluation scores represent an "average" performance level, and his teaching performance score for Fall 2022 should have

---

[1] The Dean's 8 scores represent the mean (or median) of 8 selected items from the OCQ (sample item: "I feel I learned a lot in this course"). This aggregate score is used by the KSOB Dean's office to assess an instructor's teaching effectiveness.

been between 3.0 and 3.9 (1= highest, 5 = lowest). However, Rego assigned Lalwani a score of 5 ("Unsatisfactory"), directly contradicting policy.[2]

    d.    Based on the criteria in the Marketing Department Performance Evaluation Policy, Lalwani's composite performance score should be 2.43 out of 5.00, compared to the median department composite score of 3.0, again reflecting significantly above-average overall performance.

27.    Rego cherry-picked selected student comments about Lalwani's teaching to make it look bad, violating IUB policy ACA-21. However, he ignored the overwhelmingly greater number of highly laudatory comments from the same group of students such as "Best Professor at IU," and "LAWANI IS THE BEST PROFESSOR EVER!!!!!!!" (caps and exclamations in original).

    a.    Analysis of students' open-ended comments using a text analysis software indicated that overall, students had significantly more positive than negative things to say about Lalwani's course.

    b.    Many students described Lalwani as kind, caring, passionate, enthusiastic, intelligent, engaging, well-prepared, open, fun, exciting, inclusive, and flexible.

    c.    After the semester was over, some students indicated that they had an "amazing" experience in Lalwani's class and invited him to dinner.

28.    Lalwani's colleagues with significantly lower teaching and aggregate (composite) performance scores received higher salary raises in AY 2023-2024:

---

[2] Rego indicated that a three-member committee judged Lalwani's teaching to be unsatisfactory. However, two of the three members were Rego and Smith. It is clear that the numeric rating assigned is based on Rego's feedback. Even then, that does not explain why the policy was violated.

a.    For example, Professor X, whose scores on Q18 and the Dean's 8 were significantly lower than Lalwani's (Q18 scores 2.44 vs. 5.03; Dean's 8 scores: 3.73 vs. 5.71), received a salary increment greater than $4,800 (vs. $300 for Lalwani).

b.    Analysis of student overall sentiment using a text analysis software on open-ended course comments revealed a significantly more positive response towards Lalwani's class compared to some other faculty who received higher raises.

c.    Some Full Professors with potentially lower overall performance scores received significantly higher salary raises (e.g., Y: 2.24%, Z: 2.07%) compared to Lalwani.

29.    Rego unlawfully penalized Lalwani for unfounded claims of gender discrimination and hostile classroom environment.

a.    Rego cited unsubstantiated and anecdotal allegations of gender discrimination and a hostile classroom environment as the basis for recommending the lowest salary raise for Lalwani for AY 2023-2024.

b.    Lalwani's student evaluations, particularly the OCQ item "The instructor created an environment in which students felt comfortable asking questions and expressing their views," yielded a mean score of 5.55 out of 7.00, well above the midpoint of 4.0. This score indicates a positive classroom environment based on an objective and approved measure and directly contradicts Rego's allegations.

c.    For comparison, Professor X, with a significantly lower score of 3.17 on the same OCQ item, was not penalized, nor was their salary increment affected. In fact, Professor X received an increase of over $4,850, despite the negative evaluations.

      d.      Similarly, other instructors in the department with substantially lower OCQ scores than Lalwani were neither criticized in their annual reviews nor penalized in their salary increments, indicating discriminatory enforcement of standards by Rego.

      e.      An independent review of Lalwani's student comments from Fall 2022 by an impartial judge found no evidence to support Rego's claims and instead highlighted a positive classroom environment.

30.      Rego's claims about Lalwani's gender discrimination and hostile classroom environment circumvent required procedures and steps.

      a.      IUB provides numerous avenues for raising, investigating, and addressing such concerns, including the Office of Institutional Equity (OIE), the Office of the Vice President for Diversity, Equity & Inclusion, the Bias Incident Response Team (BIRT), the Dean of Students Office, the LGBTQ+ Culture Center, the Student Advocates Office, and Student Legal Services.

      b.      Throughout Lalwani's 13-year tenure at IUB (including in 2022), no complaints regarding his teaching or conduct—related to gender discrimination or a hostile classroom environment—have been filed with any of these offices by students, staff, faculty, or administrators (including Rego and Raymond).

      c.      IUB policy UA-03 explicitly mandates that employees with supervisory authority must promptly report any incidents of discrimination or hostile environment to the designated campus Equity Official for investigation. Despite this policy and despite terming the concerns as "very serious" or "extremely serious," Rego did not report any such allegations to the campus Equity Official,

thereby violating IUB's mandatory reporting obligations under UA-03. He also failed to conduct an independent investigation or solicit Lalwani's perspective on the allegations.

d.      As department chair, Rego lacked the authority to punish Lalwani for these alleged infractions. Such authority lies solely with the Office of Institutional Equity (OIE), which must conduct a formal investigation before any disciplinary actions can be taken.

e.      By failing to utilize these formal evaluation and resolution channels, Rego bypassed IUB's established processes and imposed unauthorized punitive measures on Lalwani, in direct violation of institutional policies and Lalwani's due process rights.

31.    Rego accused Lalwani of a FERPA violation for allegedly disclosing student performance information. However, neither Rego, the student concerned, nor Raymond reported this violation for investigation, as required by IUB policy. Rego also denied Lalwani due process or the opportunity to defend himself.

32.    Rego's actions suggest potential retaliation:

a.      Rego's serious accusations of "extremely serious" gender discrimination, a "very serious" hostile environment, and a FERPA violation stand in stark contrast to his inaction in reporting these issues through proper channels.

b.      Despite policy mandates and the gravity of the alleged misconduct, Rego bypassed formal complaint channels.

c.      This conspicuous lack of reporting suggests a motive beyond legitimate concern – potentially retaliation for Lalwani's own discrimination complaint.

33.     Next, Rego claims that Lalwani's grading in Fall 2022 was opaque and arbitrary.

a.      However, a 5-member independent panel at KSOB conducted an in-depth investigation of Lalwani's course as well as a hearing and <u>unanimously</u> rejected this claim with a 5-0 vote.

b.      The panel concluded that "*Prof. Lalwani set clear expectations for course rules and procedures, while grading the Marketing simulation in a fair manner consistent with the grading scale he shared with the class*."

c.      Despite being presented with the panel's conclusive findings, Rego stubbornly persisted in his baseless allegations, continuing to claim that Lalwani's grading was opaque and arbitrary. Rego not only failed to conduct any investigation but also willfully disregarded the panel's clear and unanimous conclusions, demonstrating a blatant refusal to engage with the facts.

d.      Further underscoring the baselessness of Rego's claims, Lalwani's clarity in course explanations was reflected in his strong performance on the OCQ item, "Explanations of the material in this course were clear and to the point," where he scored a 5.53 out of 7.00. This score surpasses that of many other faculty members within the department who neither faced similar criticism nor were penalized.

34.     Rego and Raymond undermined Lalwani's academic freedom:

a.      Rego and Raymond allege that Lalwani violated a department recommendation advising against the use of simulations in class.

b.      The recommendation referred to M370, a team-taught course with around 200 students/section, making group work and simulations less feasible. In contrast,

in Fall 2022, Lalwani taught M304 as the sole instructor, with a smaller class size of about 65 students, making simulations both feasible and appropriate.

c.  Rego's interference in Lalwani's course content and teaching materials violated IUB's policy ACA-32, which explicitly grants faculty the right to full academic freedom in their instruction, provided they meet their academic responsibilities.

d.  Lalwani has a well-documented history of successfully integrating simulations in comparable courses, further demonstrating the pedagogical soundness of his methods.

e.  Lalwani's effective use of simulations has been a key factor in his consistently excellent teaching evaluations over the years.

f.  Student feedback from previous years overwhelmingly supports the effectiveness of Lalwani's teaching methods, including the use of simulation.

g.  In fact, Lalwani's teaching approach—combining lectures with simulations—had been previously endorsed by former Deans and explicitly approved by a former Department Chair.

35.  On or around February 9, 2024, Lalwani discovered that Rego submitted to the EEOC a memo authored by Raymond containing libelous, defamatory, and unsubstantiated claims about Lalwani's conduct and teaching.

a.  The memo and its contents were unsolicited, violating IUB policies ACA-17, ACA-27, and BL-ACA-D22, which strictly prohibit unsolicited content in academic employees' personnel files except under narrowly defined circumstances, none of which apply to Lalwani.

b.       Even if such circumstances were relevant, IUB policies ACA-27 and ACA-33 required Rego to notify Lalwani about the memo, provide him a copy, and give him an opportunity to respond in writing. Rego failed to fulfill any of these obligations, indicating a deliberate attempt to undermine Lalwani's credibility without giving him a fair opportunity to contest the memo's claims, highlighting a reckless disregard for the truth.

c.       Lalwani was never formally notified of the memo nor given access to it or a chance to rebut its claims; the only version he received was an abridged copy from the EEOC, which lacked crucial context.

d.       Despite repeated formal requests from Lalwani, Rego has continued to withhold the full memo, casting serious doubt on its credibility and the procedural fairness of its inclusion in any assessment of Lalwani's professional conduct.

36.    Raymond's memo contains false information, procedural violations, and contradicts Lalwani's teaching record.

a.       The memo makes accusations that impute misconduct based on unverified and unsubstantiated comments. They are presented as factual assertions, making them defamatory *per se* under Indiana law.

b.       Raymond's false and defamatory statements directly harmed Lalwani's professional reputation in the academic community by creating a false impression of misconduct. For example, Raymond's claim that Lalwani was instructed to not simulations in Fall 2022 is demonstrably false, as corroborated by departmental records, which explicitly show no such instruction was given.

c.      Despite IUB policies ACA-33 and BL-ACA-D27 requiring direct communication of concerns, Raymond never raised any issues with Lalwani directly before escalating the matter, indicating a lack of transparency and an intent to undermine Lalwani without providing him an opportunity to correct or clarify.

d.      A 5-member independent panel at the Kelley School of Business (KSOB) previously reviewed Lalwani's course and unanimously affirmed that his grading practices were fair, transparent, and consistent, directly contradicting the claims made in Raymond's memo.

e.      By submitting the defamatory memo to the EEOC, a third party outside the university, Rego knowingly and improperly disseminated these false statements, causing substantial damage to Lalwani's professional reputation, including diminished standing among peers, loss of professional credibility, and harm to career prospects.

f.      The false statements were made with either malice or gross negligence. Raymond neglected to seek corroborating evidence or follow up with Lalwani directly before submitting the memo, ignoring readily available objective data that contradicts her claims.

37.    Raymond's memo disregards objectivity and due process:

a.      Raymond's reliance on isolated and anecdotal reports directly contradicts objective data from student feedback, which supports Lalwani's teaching methods. This inconsistency highlights Raymond's disregard for objective evidence, calling into question the reliability and truthfulness of her defamatory statements.

b.      Raymond bypassed all informal resolution or counseling efforts outlined in IUB policy BL-ACA-D27 before drafting the memo. No attempt was made to resolve perceived issues through dialogue, feedback, or informal means.

c.      Raymond's memo effectively pronounces Lalwani guilty without engaging in the investigative and formal complaint channels required by IUB policy ACA-33, suggesting a prejudgment and bias that undermines the document's credibility.

d.      The memo uses inflammatory language that appears to undermine Lalwani's credibility rather than present a factual record.

e.      Raymond did not comply with IUB policy BL-ACA-D27, which necessitates a detailed statement of any prior informal efforts to resolve disputes. No such efforts were initiated, and Raymond's immediate escalation to formal action violates procedural norms, denying Lalwani a fair opportunity to address any alleged concerns before they were recorded in a formal complaint.

a.      Raymond's choice to ignore detailed, objective student evaluations—which are the standard metric for assessing teaching performance—in favor of vague and unverified anecdotes demonstrates a reckless disregard for the truth, fulfilling the standard for defamation under Indiana law.

38.     Further evidence undermines Raymond's allegations.

a.      The defamatory statements in Raymond's memo are at odds with Lalwani's 18-year record of outstanding student evaluations, multiple teaching awards, and overall performance.

b.      In his entire 18-year academic career (including in Fall 2022), Lalwani has not faced a single formal student complaint or appeal, aside from one which was

unanimously decided in his favor. This record directly contradicts the allegations of misconduct and incompetence outlined in Raymond's memo, demonstrating a biased or malicious motive that underpins the defamatory statements.

c.      Numerous students, including from the Fall 2022 semester, have repeatedly praised Lalwani as the best professor they have ever had, citing his dedication, clarity in grading, and innovative teaching methods—testimonies that stand in stark contrast to Raymond's depiction of Lalwani.

d.      Professors Krishnan and Burke have observed Lalwani's teaching methods first-hand and have attested to their effectiveness.

e.      The defamatory statements in Raymond's memo have caused Lalwani to suffer significant reputational harm, economic and monetary damages, emotional distress, and potential loss of future employment opportunities and income.

39.    Rego's explanation for the low salary increase contradicts his actions:

a.      Rego claims the *de minimis* salary increase was intended to communicate dissatisfaction with Lalwani's teaching performance.

b.      However, Rego actively and persistently refused to explain the reason for Lalwani's low salary increase or provide relevant documentation, even after Lalwani brought to his attention IUB policy ACA 27, which guarantees all IUB faculty full and complete access to unredacted records in their Personnel Files.

c.      Lalwani was forced to seek intervention from the Vice Provost for Faculty & Academic Affairs, Carrie Docherty, who compelled Rego to release the reason for the meager salary increment.

      d.     Rego has not responded to Lalwani's request for Raymond's complete memo, leaving Lalwani to rely on an abridged version provided by the EEOC.

      e.     These actions reinforce the view that Rego's stated reasons for the *de minimis* salary increment awarded to Lalwani are a false pretext for retaliation.

40.     Before Lalwani raised concerns about unlawful discrimination, Rego's behavior was cordial. However, immediately after the complaint, Rego's conduct shifted dramatically, escalating into a sustained and deliberate campaign of harassment, intimidation, and hostility towards Lalwani, fostering a toxic work environment. From that point on, whenever Rego encountered Lalwani in the hallway, he would grimace, often seething with visible anger, and would shake his head in apparent disappointment.

41.     On multiple occasions, Rego yelled and screamed at Lalwani in a threatening and aggressive manner, often with bloodshot eyes and a rage-filled expression. In November 2022, Rego screamed and yelled at Lalwani during a conversation, his face contorted in rage. On March 1, 2023, during a meeting, Rego's behavior escalated to blatant intimidation —he screamed at Lalwani at the top of his lungs and refused Lalwani's request to lower his voice, continuing to scream and ultimately ordering, "Get out of my room!" in a humiliating display of aggression.

42.     This pattern of bullying and aggressive behavior persisted, with another incident around March 23, 2023, when Rego angrily confronted Lalwani in the hallway and demanded -- without any clear reason -- that Lalwani come to his office, and ordered Lalwani not to contact other full professors, delivering his instructions in an intimidating tone.

43.     Rego's campaign of isolation and control against Lalwani is evidenced by a demeaning email dated May 12, 2023 accusing him of being "particularly prone" to misunderstandings, miscommunications, and confusions. This cruel characterization undermined

Lalwani's professional competence and reputation, flying in the face of Lalwani's exceptional scholarly record, which includes one of the best publication records in the department, his internationally recognized status as a preeminent authority in cross-cultural consumer behavior, and his prestigious role as associate editor for top academic journals. Rego brazenly copied both the outgoing and incoming Executive Associate Deans for Faculty & Academic Affairs, demonstrating his intent to humiliate Lalwani in front of high-ranking university officials.

44.    In this email, Rego demanded that all communications regarding official department matters be directed solely to him, effectively severing Lalwani's connections with his colleagues and support network. In a shocking display of authority, Rego invalidated a meeting Lalwani had with the Associate Department Chair, ordering him to disregard any discussions from that meeting. This not only reinforced Rego's control but also illustrated a pattern of belittling and psychologically abusive behavior. Furthermore, Rego instructed all full faculty members to redirect any inquiries from Lalwani back to him, creating an atmosphere of ostracism that left Lalwani feeling humiliated and isolated. Such actions severely impacted Lalwani's ability to perform his job and maintain crucial professional relationships, contributing to the unbearable work environment he faced.

45.    Rego's persistent and hostile behavior, coupled with targeted retaliation, created an unbearable atmosphere that left Lalwani experiencing significant distress, anxiety, and fear for his safety. As a result, he stopped working from the office for nearly six months, from March 1, 2023, to August 21, 2023. Lalwani communicated to Professors Dan Li and Smith that he felt threatened by Rego's conduct and unsafe in the department, leading him to work from home or other locations due to the severe, distressing, and unbearable impact of Rego's conduct.

46.    Rego's defenses violate IUB policy. First, Rego claims to have applied IUB policy ACA-33, but failed to follow the policy's requirements, including the following:

    a.    Rego did not inform Lalwani of any student complaints before imposing sanctions.

    b.    Rego did not seek informal resolution to complaints.

    c.    Rego did not provide Lalwani with copies of complaints.

    d.    Rego did not provide Lalwani an opportunity to respond.

    e.    Rego did not inform Lalwani of any sanctions.

47.    Second, Rego falsely claims that IUB applies different standards to assess teaching performance for full professors compared to others. The Marketing Department Performance Evaluation policy clearly shows that the criteria to assess teaching performance across all faculty ranks is the same. The system assigns different weights to research, teaching, and service based on rank, already accounting for expected differences in performance at different career stages.

48.    Third, Rego's claim of ignorance regarding Lalwani's discrimination complaints is undermined by the documented record.  Lalwani raised concerns about discriminatory treatment with Rego twice: indirectly in writing through the Faculty Mediation Committee on September 29, 2022, and directly verbally on or around October 25, 2022.

49.    Fourth, Rego advocates a holistic approach to faculty evaluation, yet his methods contradict this very principle. He selectively quotes student comments from the OCQs and focuses on anecdotal and subjective comments, rather than considering the full range of data. His reliance on Raymond's non-representative and unsolicited observations raises further concerns about his commitment to fairness.

50.    Delayed disclosure and inconsistent evaluations cast doubt on Rego's motives:

a.      Rego and Raymond did not raise concerns about Lalwani's Fall 2022 classroom conduct until March 2023, after Rego had already drafted Lalwani's annual review memo and likely imposed sanctions.

b.      The delay in disclosure and lack of timely intervention raise questions about the sincerity of their concerns and the fairness of the evaluation process, pointing to a retaliatory motive instead.

<u>STATEMENT OF CLAIMS</u>

**COUNT 1**
**<u>Discrimination Based on Sex-Plus and National Origin-Based Stereotypes</u>**

51.     Lalwani, a male of Indian origin, is a member of protected classes under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 (*see Compl. ¶¶ 8-11, supra.*).

52.     IUB has discriminated against Lalwani in violation of Title VII and Title IX by treating him less favorably than his similarly situated coworkers because of his color, sex and/or national origin in combination with one or more neutral characteristics, specifically, his expunged court records and sexual or cultural stereotypes of Indian males (*id. at ¶¶ 9-11*).

53.     By its unlawful acts and omissions described herein, IUB, through its agents, intentionally or recklessly deprived Lalwani of the benefits, and altered the terms and conditions, of Lalwani's employment in violation of Title VII and Title IX, as evidenced by:

a.      A sudden and dramatic change in treatment towards Lalwani following May 2016, coinciding with heightened sensitivity due to the #MeToo movement (*id. at ¶¶ 8-11*).

b.      Open shunning and hostile behavior from colleagues, which was not observed towards female employees or other Indian males (*id. at ¶¶ 9-11*).

      c.      Creation of a hostile work environment (*id. at ¶¶ 8-11*).

      d.      Unjustifiably low salary increments that did not align with Lalwani's performance (*id. at ¶¶ 9*).

54.    The discrimination against Lalwani is based on stereotypes and perceptions related to his sex and national origin, rather than on his actual conduct or performance. This constitutes unlawful discrimination under both Title VII and Title IX. Discrimination based on "sex-plus" and stereotypes about nationalities are recognized as violations of Title VII (*id. at ¶¶ 10-11*).

55.    IUB's actions would not have occurred if Lalwani were female or of a different national origin, demonstrating clear violations of Title VII and Title IX (*id. at ¶ 11*).

56.    As a direct and proximate result of IUB's unlawful discrimination in violation of Title VII and Title IX, Lalwani has suffered and continues to suffer financial and economic damages, as well as severe mental anguish, emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**COUNT II**
**Retaliation**

57.    Lalwani engaged in protected activity by raising concerns about unlawful discrimination with Rego and Prenkert in September and October 2022 (*see Compl. ¶¶ 12-13, supra.*).

58.    Following this protected activity, Lalwani suffered adverse actions, including:

      a.      Harassment, intimidation, and a hostile work environment created by Rego (*id. at ¶¶ 14, 40-45*).

      b.      Unprecedented negative performance evaluation memos prepared by Rego dated March 1, 2023 and July 11, 2023 (*id. at ¶¶ 17-20*).

    c.      An unprecedented negative performance evaluation memo prepared by Raymond dated March 23, 2023 (*id. at ¶ 35-38*).

    d.      The lowest salary increment in the department for AY2023-2024, amounting to a token 0.10% or $300, in stark contrast to the average raise of $8,425 received by other tenured and tenure-track department faculty (*id. at ¶¶ 21*).

59.    There is a clear causal connection between Lalwani's protected activity and the adverse actions, as evidenced by:

    a.      The timing of the adverse actions, which occurred shortly after Lalwani raised his concerns about unlawful discrimination (*id. at ¶¶ 12, 21*).

    b.      The dramatic shift in Rego's behavior from cordial to excessively hostile and intimidating immediately following Lalwani's complaint of discrimination, creating a toxic work environment characterized by tyrannical outbursts, public humiliation, and deliberate isolation (*id. at ¶¶ 40-45*).

    c.      The singling out of Lalwani in the entire department of about 50 faculty for a negative performance evaluation memo based on unsubstantiated comments (*id. at ¶¶ 17-19*).

    d.      The disparate treatment meted to Lalwani versus his colleagues (*id. at ¶¶ 21, 28*).

    e.      Rego's reliance on unsolicited and anonymous comments to justify Lalwani's low performance evaluation and raise, violating IUB policies ACA-17, ACA-27, and BL-ACA-D22 (*id. at ¶¶ 25*).

    f.      The stark contrast between Lalwani's performance evaluations before and after raising his concerns (*id. at ¶¶ 19*).

g.      Lalwani's history of positive performance since joining IUB in 2011 (*id. at ¶¶ 8, 19*).

h.      The stark contrast between Lalwani's annual salary increment before and after raising his concerns (*id. at ¶ 21*).

i.      The blatant disregard and violation of IUB, KSOB, and Department of Marketing policies in assessing Lalwani's performance and raise ((*id. at ¶ 15, 22-27, 30*).

60.     Rego's actions, including the negative performance evaluation and low salary recommendation, were in direct response to Lalwani's discrimination complaint, constituting unlawful retaliation under Title VII and Title IX (*id. at ¶¶ 12-13*).

61.     As a direct and proximate result of IUB's unlawful retaliation in violation of Title VII, Lalwani has suffered and continues to suffer monetary and/or economic damages as well as damage to his reputation, severe mental anguish, emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## COUNT III
## Breach of Contract

62.     IUB, through its agents, breached its contractual obligations to Lalwani by failing to adhere to specific policies and procedures that constitute express or implied terms of his employment (*see Compl. ¶¶ 9, 15, 17, 22, 30, supra.*).

a.      **Failure to Conduct Fair Performance Evaluations and Determine Salary Increment**: IUB violated its own policies (e.g., ACA-17, ACA-27, BL-ACA-E23) by conducting unfair performance evaluations and awarding Lalwani disproportionately low salary increases, despite his above-average performance

over several years. IUB's reliance on unsubstantiated information further exacerbates this breach and violates ACA-33 (*id. at ¶¶ 9, 17, 29, 35-36*).

b.    **Improper Handling of Student Complaints**: IUB failed to follow established policies and procedures for investigating student complaints, acting instead on unverified and anonymous comments. This violates Lalwani's right to a fair and evidence-based evaluation (*id. at ¶¶ 17, 25, 35*).

c.    **Use of Unsolicited and Anonymous Information**: IUB improperly relied on unsolicited and anonymous student feedback to undermine Lalwani's teaching record, in direct violation of university policies ACA-27 and BL-ACA-D22, which expressly prohibit the use of such information in faculty evaluations. By including this unsolicited and potentially biased information, IUB breached its contractual obligation to ensure objective and fair evaluations (*id.*).

d.    **Violation of Academic Freedom**: IUB breached Lalwani's right to academic freedom, as protected under IUB Policy ACA-32, by prohibiting the use of certain teaching methods, including simulations that had been effective in previous courses and had been approved by a previous Department Chair (*id. at ¶¶ 24-26*).

e.    **Failure to Follow Title IX Procedures**: IUB failed to follow Title IX procedures in addressing unsubstantiated claims of gender discrimination and a hostile classroom environment, violating IUB policy UA-03. This deviation from university policy breached the contractual expectation that such claims would be handled through formal and fair processes (*id. at ¶¶ 29-30*).

f.  **Failure to Communicate Performance Issues and Provide Opportunities to Respond**: IUB further breached its obligations by failing to communicate performance-related concerns to Lalwani in a timely and transparent manner, denying him the opportunity to respond to negative evaluations or accusations before they were used to justify adverse actions, such as salary penalties, violating ACA-27 and related policies (*id. at ¶¶ 20, 22, 36c, 37b, 37e, 46*).

63.     As a direct result of these breaches, Lalwani has been denied the benefit of his bargain and suffered significant economic loss, harm to Lalwani's reputation, and emotional distress, including financial and reputational harm, harm to his professional career and financial well-being, including, but not limited to, receiving a disproportionately low salary increments despite his superior contributions over several years (*id. at ¶¶ 9, 23-24*).

64.     IUB's failure to adhere to its own policies constitutes a material breach of Lalwani's employment agreement, which requires IUB to comply with its own policies in evaluating and compensating its faculty. These breaches have resulted in tangible harm to Lalwani's career and compensation in an amount and to an extent to be determined.

## COUNT IV
## Defamation

65.     Rego and Raymond made false and defamatory statements about Lalwani in memos submitted to the EEOC and potentially other parties (*see Compl. ¶¶ 17, 18, 35-38, supra.*).

66.     These statements include false claims about Lalwani's teaching performance, use of simulations, student complaints, conduct, and classroom behavior, many of which are contradicted by objective evidence and independent evaluations (*id. at ¶¶ 29-31, 33, 35-38*).

67.     Raymond's memo failed to include any objective data, such as student evaluations, or efforts at informal resolution as required by IU policies, instead relying on anecdotal and subjective reports that lack factual support. This reckless behavior, combined with inflammatory language, constitutes defamation *per se* (*id. at ¶¶ 33-38*).

68.     The false information in the memos was submitted without giving Lalwani an opportunity to respond, violating IUB's own policies on fair treatment of faculty and the use of unsolicited information in personnel matters (*id. at ¶¶ 17, 25, 35-37*).

69.     The malicious intent behind these actions is evident in the timing and content of the memos, which pertain to alleged misconduct in Lalwani's profession and which appear to be retaliatory in nature (*id. at ¶¶ 12, 21, 32*).

70.     The statements made by Rego and Raymond constitute defamation and demonstrate a reckless disregard for the truth (*id. at ¶¶ 17, 20, 25, 27, 29, 30-31*).

71.     The *per se* defamatory statements have caused significant harm to Lalwani's professional reputation and career prospects. As a direct and proximate result, Lalwani has suffered injuries, damages and losses in an amount and to an extent to be determined.

### COUNT V
### Due Process Violations under the Fourteenth Amendment of the U.S. Constitution

72.     IUB, acting under color of state law, deprived Lalwani of his property interest in his employment and salary without due process of law. IUB failed to follow the established procedures for evaluating faculty performance and imposing disciplinary actions, thereby violating Lalwani's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution (*see Compl. ¶¶ 39-41, supra.*).

73.     As a public institution, IUB violated Lalwani's due process rights under the Fourteenth Amendment by:

a.    Failing to provide him with notice of complaints against him  (*id. at ¶¶ 20, 36c*).

b.    Denying him the opportunity to respond to allegations before adverse actions were taken (*id.*).

c.    Disregarding established procedures for investigating complaints and imposing sanctions (*id. at ¶¶ 22, 35, 36, 37b, 37c, 46*).

d.    Making decisions based on unsolicited and anonymous information without proper vetting (*id.*).

e.    Persistently refusing to share Raymond's memo concerning Lalwani's conduct and teaching, violating IU's policies (ACA-27) that guarantee faculty the right to see their personnel files and respond to any allegations. This withholding prevents Lalwani from defending himself against the baseless accusations contained in the memo and has further compounded the violation of his due process rights (*id. at ¶¶ 35c, 35d*).

74.    These actions not only violate IUB's own policies but also run afoul of constitutional due process protections, depriving Lalwani of the opportunity to be heard and defend against unsubstantiated and baseless accusations, which is a fundamental tenet of due process.

75.    As a direct and proximate result, Lalwani has suffered injuries, harm, damages, and losses in an amount and to an extent to be determined.

### COUNT VI
### Intentional Infliction of Emotional Distress

76.    The actions of IUB, Rego, Raymond, and others were extreme and outrageous, and intended to cause severe emotional distress to Lalwani (*see Compl. ¶¶ 8-9, 35-38, 40-45, supra.*).

77.     Rego's behavior shifted dramatically from cordial to hostile immediately after Lalwani's complaint of discrimination. This sudden change manifested in a sustained campaign of harassment, intimidation, and hostility, creating a toxic work environment (*id. at ¶¶ 40-45*).

78.     This persistent pattern of bullying, aggressive behavior, and targeted retaliation created an unbearable atmosphere that caused Lalwani significant emotional suffering, anxiety, and distress, forcing him to work from home for nearly six months due to fear for his safety (*id.*).

79.     The deliberate and outrageous nature of these actions, their persistence over time, and their severe impact on Lalwani's professional and personal life meet the high threshold for intentional infliction of emotional distress (*id. at ¶¶ 8-9, 35-38, 40-45*).

80.     IUB's failure to address these issues, despite being aware of their impact through communications to other professors and high-ranking officials, further demonstrates the intentional nature of the distress caused (*id. at ¶¶ 12-13, 43-45*).

81.     IUB's inaction and failure to intervene highlight a pattern of intentional disregard, which has caused Lalwani severe distress and emotional trauma (*id.*).

82.     The persistence of this conduct demonstrates a willful intent to harm Lalwani emotionally and professionally, underscoring a pattern of extreme and outrageous conduct (*id.*).

83.     As a direct and proximate result, Lalwani has suffered injuries, damages and losses in an amount and to an extent to be determined.

### COUNT VII
### Interference with Contractual Relations

84.     Rego and Raymond intentionally interfered with Lalwani's contractual relationship with IUB by providing false and misleading information about his performance, violating university policies and creating a hostile work environment (*see Compl. ¶¶ 15, 17, 20, 22-27, 30, 35-36 40-45 supra.*).

85.     The timing and nature of the interference suggest a deliberate attempt to harm Lalwani's contractual relationship with IUB, violating the principles of fair competition and professional conduct (*id.*).

86.     The interference goes beyond mere workplace disagreements and represents a concerted effort to undermine Lalwani's position at the university (*id. at ¶¶ 43*).

87.     These actions have damaged Lalwani's standing with the university, and negatively impacted his compensation and career prospects in an amount and to an extent to be determined.

**COUNT VIII**
**Violation of Title IX of the Education Amendments of 1972**

88.     As an institution receiving federal funding, IUB is subject to Title IX, which prohibits sex discrimination in educational programs and activities.

89.     The university's actions, including the hostile work environment and disparate treatment, constitute sex discrimination under Title IX (*see Compl. ¶ 8-11, supra.*).

90.     IUB's failure to properly address Lalwani's complaints and its subsequent retaliatory actions violate Title IX's requirements for prompt and equitable resolution of sex discrimination complaints (*id. at ¶¶ 12-15, 17-22, 28, 40-45*).

91.     IUB's own policies acknowledge its obligations under Title IX, yet the university failed to follow these policies in Lalwani's case, demonstrating a systemic failure to comply with federal law (*id. at ¶¶ 30*). Indeed, Lalwani complained to IUB's Office of Institutional Equity, but got no relief from that office.

92.     As a direct and proximate result, Lalwani has suffered injuries, damages and losses in an amount and to an extent to be determined.

## COUNT IX
## <u>Violation of Equal Protection Clause</u>

93.    IUB violated Lalwani's rights under the Equal Protection Clause of the Fourteenth Amendment by treating him differently than similarly situated colleagues without a legitimate or rational basis. Lalwani's performance exceeded the departmental median, yet he received the lowest salary increase, while other faculty members with lower performance evaluations received higher raises (*see Compl. ¶¶ 9-11, 17-19, 21, 28 supra.*).

94.    IUB's actions, including disparate treatment in performance evaluations, salary decisions, and professional opportunities, demonstrate a pattern of discrimination that cannot be justified by any legitimate business interest (*id.*).

95.    This violation of constitutional rights is particularly egregious given IUB's role as a public educational institution, legally bound to uphold equal treatment and non-discriminatory practices for all employees. As an esteemed organization of higher learning, IUB sets the course for others in the state and is looked up to by the public.

96.    As a direct and proximate result, Lalwani has suffered injuries, damages and losses in an amount and to an extent to be determined.

## COUNT X
## <u>Breach of Covenant of Good Faith and Fair Dealing</u>

97.    IUB breached the implied covenant of good faith and fair dealing in its employment relationship with Lalwani (*see Compl. ¶¶ 8-11, 20-33, supra.*).

98.    This breach is evidenced by IUB's failure to act in good faith in its treatment of Lalwani, including:

      a.    Not awarding salary raises commensurate with performance (*id. at ¶¶ 9, 21*).

b.    Disregarding his history of exceptional performance (*id. at ¶¶ 19, 24*).

c.    Failing to provide fair and unbiased evaluations (*id. at ¶¶ 17, 25, 26, 35-38*).

d.    Retaliating against him for raising legitimate concerns about discrimination (*id. at ¶¶ 14, 35, 40-45*).

e.    Failing to follow established policies and procedures designed to ensure fair treatment of faculty  (*id. at ¶¶ 15, 22-27, 30*).

f.    Failing to fairly evaluate performance and provide adequate feedback (*id.*).

g.    Selectively applying disciplinary standards in a retaliatory manner (*id. at ¶¶ 14, 35, 40-45*).

99.    IUB's actions undermine the mutual trust and respect that should characterize the relationship between an institution and its faculty members.

100.    This breach has resulted in significant harm to Lalwani's career, compensation, and professional standing in an amount and to an extent to be determined.

**COUNT XI**
**Discrimination on the Basis of an Expunged Court Record**

101.    Indiana law prohibits discrimination against individuals based on an expunged court record. Under Indiana Code § 35-38-9-10, individuals with expunged records are to be treated as though the expunged incident never occurred, making it unlawful for employers to consider expunged records in employment decisions (*see Compl. ¶¶ 8-11, supra.*).

102.    Plaintiff's arrest record was expunged on or about July 11, 2016, fully sealing the record and entitling Plaintiff to be treated as though the arrest had never occurred (*id.*).

103.    Despite this, Plaintiff faced disparate treatment, hostility, and adverse employment actions following the expungement. This treatment included, but was not limited to exclusion and

shunning, denial of professional opportunities, inadequate salary raises, and other discrimination (*id.*).

104.    The adverse actions described above were based, at least in part, on the knowledge of Plaintiff's court record, which was illegally considered in decisions affecting Plaintiff's terms, conditions, and privileges of employment, in violation of Indiana Code § 35-38-9-10 (*id.*).

105.    As a result of Defendants' unlawful discrimination based on Plaintiff's expunged record, Plaintiff seeks all available relief provided by Indiana Code § 35-38-9-10.

WHEREFORE, Lalwani prays for the following relief:

A.    An order directing IUB to place Lalwani in the same position and status he would have occupied but for IUB's discriminatory, retaliatory or otherwise unlawful treatment of him, as well as to take other action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Lalwani;

B.    An award of damages in an amount to be determined, plus prejudgment interest, to compensate Lalwani for all financial, monetary and/or economic damages he suffered herein;

C.    An award of damages in an amount to be determined, plus prejudgment interest, for all non-monetary and/or compensatory damages including, but not limited to, compensation for severe mental anguish, emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering and any other physical or mental injuries;

D.     An award of damages in an amount to be determined, plus prejudgment interest, to compensate Lalwani for harm to his professional and personal reputation and loss of career fulfillment;

E.     An award of damages for any and all other monetary and/or non-monetary losses suffered by Lalwani, including punitive damages, in an amount to be determined plus prejudgment interest;

F.     An award of costs Lalwani has incurred in this action, as well as his reasonable attorney's fees to the fullest extent permitted by law; and

G.     All other relief just and proper in the premises.

<u>JURY DEMAND</u>

Plaintiff, by counsel, pursuant to Fed.R.Civ.P. 38(b), respectfully demands trial by jury of all issues triable of right by a jury.

Respectfully submitted,

/s/Clinton E. Blanck
Clinton E. Blanck, 19270-32
BLANCK LEGAL, P.C.
9245 North Meridian Street, Suite 301
Indianapolis, Indiana  46260
Office:  (317) 844-8372
Facsimile:  (317) 573-5564
E-mail:  cblanck@blancklegal.com
Attorney for Plaintiff